# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 5, 2012

Lyle W. Cayce
Clerk

No. 11-10171

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MELODY MARIE RODRIGUEZ,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, SMITH, and HIGGINSON, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Melody Rodriguez pleaded guilty of possession with intent to distribute more than fifty grams of a mixture and substance containing methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). Her sentence was calculated based on a quantity of actual methamphetamine or "ice" of more than 1.5 kilograms. The court enhanced the sentence for her possession of a rifle, her lead-

No. 11-10171

ership role, and the determination that her offense involved the importation of methamphetamine. The court then made a downward departure for Rodriguez's assistance to the government's investigation of other individuals. The court calculated the sentence by dividing the bottom of the guideline range in half, resulting in 180 months' imprisonment and five years of supervised release.

Rodriguez appeals the determination that (1) her offense involved the importation of methamphetamine and (2) the amount of methamphetamine or "ice" was greater than 1.5 kilograms. We affirm.

I.

The sentence was enhanced under U.S.S.G. § 2D1.1(b)(4) because the district court determined that the offense "involved the importation of amphetamine or methamphetamine. . . ." Rodriguez argues that theoffense did not involve the importation of methamphetamine, because the importation was complete before she came into possession, and she was not involved in the importation. Because we do not construe "involved the importation" as narrowly as does Rodriguez, we agree with the district court that her offense involved the importation of methamphetamine.

The methamphetamine was transported from Mexico to the Dallas area by the La Familia drug trafficking organization, then stored in the "stash house" of its local leader, Arnulfo Hernandez. Hernandez sold the methamphetamine to Rolando Vasquez, who sold it to Rodriguez on about six to ten instances over the course of approximately two to three months. Hernandez sometimes accompanied Vasquez to deliver the drugs to Rodriguez.

Rodriguez and the government agree that importation of a controlled substance "is a continuous crime that is not complete until the controlled substance reaches its final destination point." *United States v. Gray*, 626 F.2d 494, 498 (5th Cir. 1980). Rodriguez argues that the final destination was Hernandez's

No. 11-10171

"stash house," where the drugs were stored before being distributed to Vasquez and Rodriguez, so Rodriguez's possession happened after the importation was complete. Even if we accept Rodriguez's narrower interpretation of "importation," it means only that she did not import the drugs, not that her possession did not involve importation.

The scope of actions that "involve" the importation of drugs is larger than the scope of those that constitute the actual importation. If the Sentencing Commission had wanted section 2D1.1(b)(4) to apply only to the importation of methamphetamine, "it would have used the language it used in the prior subsection, which applies a separate enhancement only '[i]f the defendant unlawfully imported or exported a controlled substance' under certain circumstances." *United States v. Perez-Oliveros* 479 F.3d 779, 784 (11th Cir. 2007) (quoting U.S.S.G. § 2D1.1(b)(2)). Here, "involved" means "included in the process of." Just as building a house may involve importing building materials, possessing methamphetamine in Dallas may involve its importation to the Dallas area. Rodriguez's proximity, familiarity, and repeated business with the importers justifies the enhancement. Accordingly, we sustain the district court's application of section 2D1.1(b)(4) to Rodriguez's offense.

## II.

Rodriguez contends that, even if her offense did involve the importation of methamphetamine, section 2D1.1(b)(4) includes an implicit *mens rea* requirement of knowledge, and there is no evidence that Rodriguez knew the drugs were imported. We need not reach the question of whether knowledge is required for section 2D1.1(b)(4), because there is sufficient evidence to support the finding that Rodriguez knew the drugs were imported. Our review of the district court's factual findings is for clear error. *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008).

No. 11-10171

Rodriguez and her husband had an established relationship with Vasquez, from whom they had been buying drugs weekly for at least nine months. Rodriguez had been buying from Vasquez for only about three months, but she took over for her husband after he was incarcerated. Furthermore, Hernandez, the local leader of a drug-trafficking organization based in Mexico, would sometimes accompany Vasquez to Rodriguez's house to deliver drugs. Rodriguez's husband was sufficiently familiar with Hernandez that he referred to him by the nickname "Primo." It is not clearly erroneous for the district court to infer from these facts that Rodriguez knew of the drugs' source in Mexico.

III.

Rodriguez claims the district court lacked sufficient evidence for its conclusion that she was responsible for a total of 1.66 kilograms of methamphetamine. We review the district court's factual determinations for clear error, *id.*, and we conclude that the court did not clearly err in its determination, because there was sufficient evidence on which to base its determinations of the quantity and purity of the methamphetamine mixture.

The court based its determination that Rodriguez distributed approximately 1.66 kilograms on testimony that she purchased approximately eight ounces from Vasquez on six to ten occasions. Rodriguez contends that there was insufficient evidence on the purity of the 1.66 kilograms of methamphetamine mixture, because only 306.9 grams of methamphetamine was seized from Rodriguez.

We disagree. The three samples of mixture recovered from Rodriguez had purities of 97.1%, 97.6%, and 98.2% methamphetamine. There was also testimony that Vasquez was Rodriguez's sole supplier and that Hernandez was Vasquez's sole supplier. Furthermore, all of the transactions between Rodriguez and Vasquez were at the constant price of $1,100 per ounce of mixture. It is there-

No. 11-10171

fore not clear error to infer that the unseized drugs had similar purity levels. This is especially true given that the sentencing guidelines recommend the same base offense level so long as the offense involved at least 1.5 kilograms of a mixture consisting of at least 80% methamphetamine.[1] Therefore, the district court only had to conclude that the unseized mixture was more than 80% pure, a conclusion for which there was ample evidence.

The judgment of sentence is AFFIRMED.

---

[1] *See* U.S.S.G. § 2D1.1(c)(1) (assigning a base offense level of 38 for offenses involving at least 1.5 kilograms of actual methamphetamine or "ice," which is defined as a mixture containing at least 80% methamphetamine).