**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-4002**

UNITED STATES OF AMERICA,

> Plaintiff - Appellee,

v.

BRADLEY SCOTT WILLIAMS,

> Defendant - Appellant.

**No. 20-4086**

UNITED STATES OF AMERICA,

> Plaintiff - Appellee,

v.

LARRY LEVI BENNETT,

> Defendant - Appellant.

**No. 20-4123**

UNITED STATES OF AMERICA,

> Plaintiff - Appellee,

v.

JAMES ROBERT JOHNSON, a/k/a Jamie,

Defendant - Appellant.

_____

**No. 20-4225**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SHAWN WAYNE FARRIS,

Defendant - Appellant.

_____

Appeals from the United States District Court for the Western District of Virginia, at Abingdon. James P. Jones, Senior District Judge. (1:18-cr-00025-JPJ-PMS-27; 1:18-cr-00025-JPJ-PMS-14; 1:18-cr-00025-JPJ-PMS-7; 1:18-cr-00025-JPJ-PMS-1)

_____

Argued: September 24, 2021                    Decided: November 23, 2021

_____

Before NIEMEYER, AGEE, and QUATTLEBAUM, Circuit Judges.

_____

Affirmed by published opinion. Judge Quattlebaum wrote the opinion in which Judge Niemeyer and Judge Agee joined.

_____

**ARGUED:** Nicholas David Smith, DAVID B. SMITH, PLLC, Alexandria, Virginia, for Appellants. Samuel Cagle Juhan, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee. **ON BRIEF:** Neil A. Horn, NEIL HORN, P.C., Roanoke, Virginia, for Appellant Williams. David B. Smith, DAVID B. SMITH, PLLC, Alexandria, Virginia, for Appellant Johnson. Correy A. Diviney, STRICKLAND,

2

DIVINEY, SEGURA & BYRD, Roanoke, Virginia, for Appellant Bennett.  Wynn A. Harding, Harrisonburg, Virginia, for Appellant Farris.  Thomas T. Cullen, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

———————

QUATTLEBAUM, Circuit Judge:

Bradley Scott Williams, Larry Levi Bennett, James Robert Johnson and Shawn Wayne Farris each pled guilty to conspiracy to distribute and possess with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841.[1] While their pleas did not specify that the methamphetamine was of Ice-level purity, the district court at sentencing found that the conspiracy involved Ice and that each was responsible for its distribution. Based on those findings, the district court sentenced appellants using the drug-quantity table in Section 2D1.1(c) of the Guidelines ("Ice Guidelines").

Williams, Bennett, Johnson and Farris challenge their sentences, arguing first that the court should have categorically rejected the Ice Guidelines on policy grounds due to the 10-to-1 sentencing disparity between Ice methamphetamine and lower-purity methamphetamine. *See* U.S. Sent'g Guidelines Manual § 2D1.1(c) (U.S. Sent'g Comm'n 2016, 2018). Williams, Johnson and Bennett further argue that the district court failed to individually assess the drug purity of the methamphetamine attributed to each of them. More specifically, they assert it was not reasonably foreseeable to them that the conspiracy involved Ice, which the Guidelines define as methamphetamine that is at least 80% pure. Separately, Johnson argues that the district court failed to consider his argument that his

---

[1] Williams, Johnson and Farris pled guilty to the conspiracy in Count 1 of the indictment. Bennett pled guilty to the conspiracy in Count 1 and a substantive distribution offense in Count 6 of the indictment.

4

Presentence Report substantially overrepresented his criminal history. Having considered these arguments, we affirm the district court's decision.

## I.

On October 24, 2018, a grand jury returned a 17-count indictment against 28 defendants for their involvement in a methamphetamine distribution conspiracy. The conspiracy spanned from approximately January 2016 through October 2018, and involved methamphetamine trafficked between California, southwestern Virginia and northeastern Tennessee. One of the appellants, Shawn Farris, led the conspiracy. Several co-defendants pled guilty with plea agreements in which they admitted that the conspiracy involved methamphetamine of Ice-level purity and stipulated as to drug weight and the applicability of the Ice Guidelines to their conduct. Williams, Bennett, Johnson and Farris, however, pled guilty without a plea agreement and did not stipulate as to the purity of the methamphetamine with which they were involved.

In anticipation of sentencing, the United States Probation Office prepared Presentence Reports, which set forth each appellant's criminal history, personal information and background, the circumstances of the offense and individual involvement in the conspiracy. The reports also recommended sentences based on the application of the Sentencing Guidelines and the Ice Guidelines. Each appellant objected to the use of the Ice Guidelines. They objected to their use at all due to the 10-to-1 sentencing disparity compared to regular methamphetamine and urged the district court to reject the Ice Guidelines on policy grounds. Williams, Johnson and Bennett also objected to the purity

5

levels of the drugs attributed to them, arguing it was not reasonably foreseeable that the conspiracy involved Ice. Finally, Johnson argues the district court failed to consider his argument about his criminal history.

During sentencing hearings, the government presented evidence supporting the application of the Ice Guidelines. The district court overruled each appellants' objections and sentenced each of them under the Ice Guidelines. Appellants timely appealed their sentences, and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

II.

A.

Appellants first argue that the district court should have rejected the Ice Guidelines for policy reasons. As discussed above, there is a 10-to-1 ratio in the treatment of the methamphetamine mixture and Ice methamphetamine under the Sentencing Guidelines. For example, to reach the base offense level of 38 (the highest base offense level in the Section 2D1.1(c) drug quantity table), the defendant must possess 45 kilograms or more of methamphetamine. But a defendant reaches that same offense level with only 4.5 kilograms of Ice. The Sentencing Commission adopted the 10-to-1 ratio, which finds its origins in the mandatory-minimum penalties contained in 21 U.S.C. § 841(b)(1)(A) and (B). *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 6470(g)-(h), 102 Stat. 4181, 4378 (codified at 21 U.S.C. § 841(b)(1)); U.S. Sent'g Guidelines Manual § 2D1.1(c) cmt. 10 (U.S. Sent'g Comm'n 1989).

Under *United States v. Booker*, 543 U.S. 220, 245 (2005), Sentencing Guidelines are "effectively advisory." As a result, a court can "tailor the sentence in light of other statutory concerns as well." *Id.* For that reason, district courts have discretion to reject the Ice Guidelines on policy grounds and, as appellants note, some have done so. But just because you can does not mean you must. "Although a sentencing court may be entitled to consider policy decisions underlying the Guidelines, including the presence or absence of empirical data . . . it is under no obligation to do so." *United States v. Rivera-Santana*, 668 F.3d 95, 101 (4th Cir. 2012) (internal citation omitted). Here, the district court decided not to reject the Ice Guidelines because of the vastness of this conspiracy and the danger posed by Ice and the appropriateness of treating higher purity methamphetamine more seriously than lower purity methamphetamine. The district court had discretion as to whether or not to reject the Ice Guidelines. We find no abuse of that discretion in the district court's decision.

### B.

Appellants next argue that the district court erred in applying the Ice Guidelines. In the case of jointly undertaken criminal activity, like the drug conspiracy here, a base-level offense may be based on all acts and omissions of others that were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S. Sent'g Guidelines Manual § 1B1.3(a)(1)(B) (U.S. Sent'g Comm'n 2016, 2018); *see also United States v. Irvin*, 2 F.3d 72, 77–78 (4th Cir. 1993) (noting the Sentencing Guidelines' recognition that a "coconspirator is held accountable for the quantity of drugs reasonably foreseeable to

7

him within the scope of his unlawful agreement" incorporates the "concept of reasonable foreseeability as described in *Pinkerton*"[2]). Appellants challenge the district court's assessment as to what was reasonably foreseeable to each appellant. More specifically, the appellants argue that the district court failed to perform an individualized assessment of whether the conspiracy's involvement in Ice, as opposed to the sale of a lower purity methamphetamine, was reasonably foreseeable to each appellant.

Our Court has not specifically addressed the type of evidence required to establish that it was reasonably foreseeable to a defendant that the conspiracy of which he was a part involves Ice. The Seventh and Eighth Circuits have addressed this issue using somewhat different approaches. In *United States v. Walker*, 688 F.3d 416, 422–25 (8th Cir. 2012), the Eighth Circuit rejected challenges to the district court's use of the Ice Guidelines where the government did not provide evidence such as the manufacturer of the drug or results of tests from samples that showed the purity of the drug. The court held that it had "consistently rejected arguments demanding direct evidence of drug identity, quantity, or purity." *Id*. at 423. It explained that such requirements are "contrary to the flexible Guidelines approach of allowing the sentencing court broad discretion to consider a wide range of relevant evidence from a variety of sources as long as the evidence has sufficient indicia of reliability to support its probable accuracy." *Id.* (citations and internal quotations omitted). Thus, the court permitted consideration of the source of the drug, its appearance and form, its price, reports of its identity and quality by users and distributors. *Id.* at 424.

---

[2] *Pinkerton v. United States*, 328 U.S. 640 (1946).

And in affirming the sentences imposed by the district court, the Eighth Circuit held that the government met its burden of proof where one of the two defendants admitted to distributing methamphetamine and Ice methamphetamine more than fifty times in a proffer statement and the other repeatedly admitted receiving and distributing Ice. *Id*. at 419–20, 424–425. Additionally, co-conspirators described the way the Ice appeared and burned as evidence of its purity. *Id.* at 420.

The Seventh Circuit requires more specific evidence. In *United States v. Carnell*, the government offered testimony and statements that "everyone referred to the drugs as ice," and users' and dealers' descriptions of the substance as "crystalline" or "glass like shards." *United States v. Carnell*, 972 F.3d 932, 941-42 (7th Cir. 2020) (internal quotation marks omitted). In holding that such descriptions, without evidence from a "chemist or other relevant expert that methamphetamine cannot form a crystalline structure below 80% purity" *id.* at 942, the court explained:

> It is abundantly clear that the "80%" language has meaning. And although it makes sense in the context of crack and cocaine to define the users, dealers, and law enforcement officers as the experts in the field at distinguishing between the drugs, it cannot carry the government's burden in a case alleging methamphetamine ice. The government must prove, albeit only by a preponderance of evidence at sentencing, that the substance was, in fact methamphetamine of at least 80% purity. We think it defies common sense that even the most experienced dealer, user, or police officer could somehow detect the difference between 79% pure methamphetamine and 80% pure methamphetamine. We therefore reject the Eighth Circuit's conclusion that the same kind of evidence that suffices for distinguishing between crack and cocaine—the experience of users, dealers and law enforcement officers, without more—suffices to meet the burden of proving that a particular drug is 80% pure methamphetamine.

*Id.* at 941.

9

We agree with the Seventh Circuit that the language in the Ice Guidelines requiring 80% purity must have meaning. And certainly, lab results of the drugs from the conspiracy at issue often provide the best evidence that the conspiracy, in fact, involves Ice. But we cannot conclude that such evidence is required in every case. After all, as the Eighth Circuit explained, the Sentencing Guidelines do not "require absolute certainty about the amount of drugs or their purity when the drugs are not seized or the amount seized does not reflect the scale of the offense." *Walker*, 688 F.3d at 423 (quoting *United States v. Cockerill*, No. 99–4634, 2000 WL 852608, at \*2 (4th Cir. June 28, 2000)). Thus, the district court must have latitude to consider whatever reliable evidence is available to make its 80% purity determination. That can include evidence of a drug's source, price and appearance as well as statements or testimony by co-conspirators, users or dealers. However, while such evidence may be used, it must be sufficiently reliable and specific that it actually supports the government's position that the drug's purity is 80% or above.[3]

With those principles in mind, we turn to the evidence here. And we start our analysis with the Drug Quantity Table found in Section 2D1.1(c) of the Guidelines. The Drug Quantity Table contains a scale of base-offense levels that corresponds to the type and quantity of drugs involved. Three different types of methamphetamines are referenced in the table: Methamphetamine, Methamphetamine (actual), and Ice. The Notes to the Drug

---

[3] District courts are better equipped than circuit courts to make these determinations in the first instance and their determinations will, of course, be based on the records presented in their entirety. But to explain our instruction that indirect evidence of 80% purity be sufficiently reliable and specific, evidence that Ice was commonly used in the geographic area of the conspiracy, for example, would not, without some indirect evidence specifically connected to the defendant, be sufficient.

Quantity Table define Ice as follows: "'Ice,' for the purposes of this guideline, means a mixture or substance containing d-methamphetamine hydrochloride of at least 80% purity." U.S. Sent'g Guidelines Manual § 2D1.1(c) (U.S. Sent'g Comm'n 2016, 2018). Thus, a district court must evaluate whether, under the record, it was reasonably foreseeable to each individual defendant that the conspiracy involved methamphetamine of at least 80% purity. Further, the district court finds facts relevant to determining a Guideline's range by the preponderance of the evidence standard. *United States v. Cox*, 744 F.3d 305, 308 (4th Cir. 2014).

The district court determined that the evidence as a whole, "both circumstantial and direct, indicates that the conspiracy itself was centered on [I]ce methamphetamine and that the defendants knew or reasonably should have known of that fact." J.A. 177. That evidence included Drug Enforcement Administration ("DEA") lab reports that showed over two kilograms of Ice methamphetamine within the conspiracy. Almost all of the samples had substance purity of 95% or above with a 4% margin of error, well within the Guideline's definition of Ice. The evidence also included the stipulations of co-defendants about the conspiracy involving Ice methamphetamine, the statements and testimony of co-conspirators and co-defendants closely connected to each appellant declaring Ice was central to the conspiracy and the testimony of field experts about what was trafficked in the region.

But, as appellants note, it is not enough for the district court to look at the evidence collectively. An individualized assessment is required. Thus, we will review the district court's rulings as to each appellant in view of the evidence.

11

## 1. Bradley Scott Williams

Williams' Presentence Report described his general participation in the conspiracy and determined he was responsible for at least 1.5 kilograms of Ice methamphetamine. At the hearing, the government submitted a chart summarizing the stipulations of the co-defendants as to weight and Ice levels of purity, highlighting that a co-defendant with whom Williams worked stipulated to at least 1.5 kilograms of Ice methamphetamine. In addition, the government presented excerpts of grand jury testimony of a co-defendant identifying Williams as a direct supplier, along with the testimony of another close contact of Williams who received quantities from him. Another co-defendant testified that she gave methamphetamine to and received methamphetamine from Williams.

In addition, the government introduced evidence that police arrested Williams pursuant to a traffic stop in 2017 and seized approximately 59.72 grams of methamphetamine from him, which the officials then sent to a lab for testing. Related to those drugs, the government called Chris Parks, a task-force officer with the DEA, to testify. Parks testified that the analysis revealed that the drugs were 100% pure Ice methamphetamine. Officer Parks also testified about the analysis of methamphetamine seized from other defendants within the conspiracy which revealed purity levels qualifying as Ice methamphetamine.

In overruling Williams' objections, the district court outlined his involvement with the conspiracy and transactions between Williams and other co-defendants and conspirators. The court referenced testimony from one co-defendant who claimed that she introduced Williams directly to Farris, the leader of the conspiracy, as a supplier. The

district court concluded that the government met its burden of showing Williams was responsible for the drug quantity attributable to him based on testimony linking Williams to the organizer of the conspiracy and the large quantity of drugs trafficked by the conspiracy.

The district court held Williams accountable for at least 1.5 kilograms of Ice methamphetamine. It found his total offense level to be 33 and his criminal history to fall in the VI category, translating into a Guideline-custody range of 235 to 293 months. The court imposed a below-Guideline sentence of 204 months in prison because of Williams' relatively short period of participation in the conspiracy.

## 2. Larry Levi Bennett

At Bennett's initial sentencing hearing, the government referred to his Presentence Report, which described his participation in the conspiracy and attributed 4.5 kilograms of Ice methamphetamine to him. The government also introduced the same chart summarizing the plea stipulations of other defendants concerning purity and weight. In addition, the government presented excerpts of the grand jury testimony of a co-defendant who testified that on several occasions, she sold 13 pounds of methamphetamine for Farris, the leader of the conspiracy, to Bennett and his girlfriend. The government also presented several text messages between Farris and another co-defendant referencing Bennett's role in the conspiracy.

In addition, Parks testified about his involvement in the investigation underlying Bennett's case. He also testified that, in recent years, Ice methamphetamine was increasingly popular in the area of the conspiracy and that, from his experience, the Ice

often came from Mexico. Parks acknowledged that one cannot "eyeball this stuff [methamphetamine] and figure out whether or not it has a purity level," but testified that there were "several certificates of analysis that were issued by the DEA lab in this case for ice, and determined to be ice associated with the larger Farris conspiracy." J.A. 90.

The district court overruled Bennett's objections and detailed the testimony that supported attributing Ice methamphetamine to him. The court acknowledged that tests analyzing methamphetamine seized from Bennett as part of a controlled purchase tested at a 44% purity level, which is below the 80% level required for Ice. But the court relied on other evidence consistent with Bennett's knowledge that the conspiracy involved Ice to attribute Ice methamphetamine to Bennett. A confidential source told law enforcement that she had received methamphetamine nearly every day since early 2017 from Farris, and that she had given almost all of that methamphetamine to Bennett, who in turn sold it. The district court also relied on grand jury testimony of a co-defendant admitting she was Bennett's primary supplier. Importantly, this co-defendant later, in pleading guilty, stipulated the conspiracy involved Ice methamphetamine. In overruling Bennett's objections, the district court specifically reasoned that, although tests of the drugs seized from Bennett revealed they were less than 80% pure, the balance of the evidence and the nature of the conspiracy, showed Bennett's role in the conspiracy that involved Ice methamphetamine.

Later, the district court held Bennett accountable for at least 4.5 kilograms of Ice methamphetamine. Based on a total offense level of 35 and a criminal history of IV, the

14

Sentencing Guidelines recommended an imprisonment range of 235 to 293 months. The district court sentenced Bennett to a 235-month prison term.

### 3. James Robert Johnson

Johnson's Presentence Report described his participation in the conspiracy and determined that he was responsible for at least 4.5 kilograms of Ice methamphetamine. The district court overruled Johnson's objections, including an objection to the quantity of drugs, and accepted the report's findings concerning Johnson's involvement with the conspiracy. The government also presented evidence to support Johnson's sentencing under the Ice Guidelines. First, it put forth the same summary chart of the stipulations of co-defendants as to weight and purity level. The government pointed out that the three co-defendants most "closely affiliated" with Johnson all stipulated to their offense involvement in Ice methamphetamine. J.A. 135. The government also presented ten lab certificate analyses of methamphetamine seized from co-defendants that revealed purity levels qualifying as Ice. The government acknowledged that the drugs at issue in those tests did not come from Johnson or the three defendants most closely affiliated with him, but it also presented evidence of Johnson's role in the conspiracy generally.

In addition, the government called Special Agent Justin Masuhr of the Bureau of Alcohol, Tobacco, Firearms and Explosives to testify about his familiarity with the methamphetamine drug trade, including that a higher purity of methamphetamine from Mexico frequently appeared in the area of the conspiracy. Masuhr testified that "since the ice has been introduced into this area, what they call the shake and bake, the homemade meth that's less of a grade, has pretty much almost gone to -- almost to zero now. It seems

15

to be almost all imported. More the ice shards. We don't see a lot of the homemade method anymore." J.A. 138.

The district court found that Johnson worked closely with three co-defendants along with other co-conspirators. The court relied on a confidential source's report to law enforcement that she had obtained and used methamphetamine from Johnson. The court also looked to text messages between Johnson and an unindicted co-conspirator about methamphetamine orders. In addition, another confidential source reported that Johnson had been her source of drugs and that Johnson's source was one of the co-defendants who stipulated that her role in the conspiracy involved Ice methamphetamine. Other co-defendants told law enforcement that Johnson was a supplier and identified Johnson's sources. Following Johnson's arrest in 2018, he admitted that he obtained from 3.5 grams to a little over 28 grams of methamphetamine a couple of times a week for two years.

The district court found that Johnson had a total offense level of 35 and a criminal history category of II, which under the Sentencing Guidelines translated to an incarceration range of 188 to 235 months. In his sentencing memorandum, Johnson requested a "departure/variance" from the Guidelines because his criminal-history category did not reflect his actual criminal history. He argued his criminal history should fall within category I. He also requested the court grant a two-offense-level variance so that he would benefit from the First Step Act safety valve application which, although part of the statute, had not been ratified in the Guidelines. The district court granted the variance based on the First Step Act and Johnson's "limited criminal history." J.A. 233. The court sentenced Johnson to a prison term of 151 months.

## 4. Shawn Wayne Farris

At his sentencing hearing, Farris conceded to his involvement in excess of 4.5 kilograms of methamphetamine but he objected to the application of the Ice Guidelines on policy grounds.[4] To support the application of the Ice Guidelines, the government presented the testimony of Parks. Parks testified that, as part of the investigation into this conspiracy, the DEA identified a co-defendant, who was receiving packages from Farris, as a supplier of methamphetamine. The government introduced analysis reports of the methamphetamine in packages shipped from Farris to that co-defendant in April 2018. The reports analyzed approximately 220 grams of methamphetamine and found it was 99% pure. Parks also testified as to other lab reports analyzing an additional amount of over two kilograms of methamphetamine from the conspiracy that revealed Ice levels of purity. He also testified that, based on his years of experience, the methamphetamine trafficked in the conspiracy was of a high purity.

The government introduced evidence that Farris led the conspiracy, which was extensive in its operation and in the quantities of drugs exchanged. Farris moved from California to Bristol, Virginia, to begin distributing methamphetamine and also had a stash house in Bristol, Tennessee. Law enforcement's investigation revealed that Farris used several sub-distributors including many co-defendants. Several confidential informants and others testified to receiving multiple quantities of methamphetamine from Farris and

---

[4] As discussed above, this policy argument is meritless. And although Farris did not join in the other appellants' reasonable-foreseeability argument, we include him in our merits analysis as reasonable foreseeability is a necessary element of establishing his base offense level.

provided other details about distribution and communication regarding various quantities of methamphetamine.

Based on this evidence, the district court overruled Farris' objections. With a total offense level of 41 and a criminal history category of VI, Farris' Sentencing Guidelines imprisonment range was 360 months to life. The court imposed a bottom-of-the-Guidelines sentence of 360 months.

C.

Having reviewed the record as it pertains to each appellant, we find no reversable error. Whether it is foreseeable to each appellant that the conspiracy involved Ice is "a question of fact which will only be overturned on appeal if it is clearly erroneous." *United States v. Vinson*, 886 F.2d 740, 742 (4th Cir. 1989); *see also United States v. Ekwunoh*, 12 F.3d 368, 370 (2d Cir. 1993) ("Included within the 'clearly erroneous' rubric is the question of reasonable foreseeability."). The evidence described above satisfies us that the district court conducted an individualized assessment of the foreseeability that the conspiracy involved Ice. Importantly, the standard of proof for findings of facts made during sentencing is preponderance of evidence. *Vinson*, 886 F.2d at 741–42. Given the evidence presented as to each of the appellants, it was not clearly erroneous for the district court to determine that the government met its burden of proving the conspiracy involved Ice. We also conclude the district court did not err in determining that the testing results of some of the methamphetamine in the conspiracy, as well as the circumstantial and direct evidence as a whole, was sufficient to establish that this conspiracy was centered on Ice

18

methamphetamine and that each appellant knew or should have known that fact. *See United States v. Lopes-Montes,* 165 F.3d 730, 731–32 (9th Cir. 1999).

Thus, we affirm the district court's application of the Ice Guidelines.

D.

Finally, we examine Johnson's contention that the district court abused its discretion in failing to consider his arguments that he should be sentenced under criminal history category I, not II. He contends two additional points were added to his criminal history calculation for being on probation for a DUI charge during 30 days of the conspiracy. That DUI offense also added one point to the criminal history calculation. Thus, at the sentencing phase, Johnson argued that his Presentence Report overrepresented the seriousness of his criminal history, warranting a downward variance. Johnson also requested a two-level variance so that he would benefit from the First Step Act's safety valve application. While the safety valve provision in the statute had not yet been adopted as part of the Guidelines, Johnson argued that the requested variance would allow him to receive the Act's benefit. He claims our decision in *United States v. Blue*, 877 F.3d 513 (4th Cir. 2017), required the district court to address his arguments and its failure to do so constitutes an abuse of discretion.

The district court, however, sufficiently addressed Johnson's arguments. At Johnson's sentencing hearing, the court stated:

> And I also recognize that the guidelines, which are always not completely accurate in terms of predicting future criminal conduct, may lift him a little higher because of the nature and timing of his prior offenses. But the fact is that the sentence I impose today I believe is appropriate, taking into account

19

the serious nature of his offense, the need for deterrence, and to provide just punishment.

J.A.233. Then the court explained it "downwardly depart[ed] from the guidelines based on the change in the statute which has not yet been ratified in the sentencing guidelines, but I believe justly should be, to recognize the fact that he has a limited criminal history." J.A. 233.

These excerpts indicate that the district court addressed Johnson's arguments. It acknowledged that "the guidelines . . . are always not completely accurate in terms of predicting future criminal conduct [and] may lift him a little higher because of the nature and timing of his prior offenses." J.A. 233. It also explained that Johnson had "a limited criminal history." J.A.233. These comments relate directly to Johnson's objections and, as such, indicate the district court considered Johnson's criminal-history argument and granted the relief it determined was appropriate in this case. Thus, we find no error or abuse of discretion.

III.

For the reasons outlined above, the sentences imposed by the district court are

*AFFIRMED.*